**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEYS FOR APPELLANTS:

**BURKE L. RICHESON**
Jones Huff & Jones
Plymouth, Indiana
for N.D., the Mother

**JUNE E. BULES**
Plymouth, Indiana
for O.Y., the Father of K.D. and B.Y.

**ANTHONY J. WAGNER**
Wyland, Humphrey, Wagner & Clevenger, LLP
Plymouth, Indiana
for W.B., the Father of K.B.

ATTORNEYS FOR APPELLEE:

**CHRISTOPHER R. BERDAHL**
Indiana Department of Child Services
Plymouth, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana



FILED
Jul 17 2012, 9:22 am
CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of K.D., K.B., and B.Y., minor children, and N.D., the mother, and O.Y., the father of K.D., and B.Y., and W.B., the father of K.B., | ) ) ) ) ) | |
| N.D., O.Y., and W.B., | ) ) | |
| Appellants-Respondents, | ) ) | |
| vs. | ) ) | No. 50A05-1110-JT-568 |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE MARSHALL CIRCUIT COURT
The Honorable Deborah Domine, Special Judge
Cause No. 50C01-1102-JT-1, -2, and -3

**July 17, 2012**
**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

N.D. ("Mother"), O.Y., and W.B. appeal the involuntary termination of their parental rights to their respective children. Mother and O.Y. both challenge the sufficiency of the evidence supporting the trial court's judgment. W.B. argues that he was denied due process of law and received ineffective assistance of counsel during the termination hearing.

We affirm.

### FACTS AND PROCEDURAL HISTORY

Mother is the biological mother of K.D., born in June 2002, K.B., born in August 2004, and B.Y., born in September 2007. O.Y. is the biological father of K.D. and B.Y. W.B. is the biological father of K.B. The facts most favorable to the trial court's judgment reveal that, in November 2009, all three children were removed from Mother's care by the local Marshall County office of the Indiana Department of Child Services ("MCDCS") due to substantiated allegations of educational neglect and admitted methamphetamine use by Mother in the family home. At the time of the children's removal, neither biological father was available to care for his child/children as both were incarcerated. O.Y. was incarcerated in the Marshall County Jail on dealing methamphetamine charges. W.B. had been incarcerated since 2004 in a federal prison in Pekin, Illinois, on an illegal possession of firearms conviction.

Two attempts at relative placement for the children were initially made, but neither placement was successful, and the children were eventually placed together in licensed foster care. Meanwhile, Mother failed to fully engage in the court-ordered provisional

reunification services. Consequently, in February 2010, K.D., K.B., and B.Y. were each determined to be a child in need of services ("CHINS").

In March 2010, the trial court entered dispositional orders formally removing all three children from their respective parents' care and custody. The trial court's dispositional orders further directed all three parents to successfully complete a variety of tasks and services designed to facilitate reunification, including: (1) parenting and substance abuse evaluations and any resulting treatment recommendations; (2) random drug screens; and (3) regular visitation with the children. Mother and O.Y. were also ordered to refrain from associating with anyone they knew or suspected to be involved with drug activity of any kind, cooperate with MCDCS, and notify MCDCS of any changes in address or household composition within five days. In addition, Mother was directed to maintain a stable source of income and suitable housing for herself and the children.

MCDCS did not initially make any referrals for services for either of the fathers due to their respective incarcerations. Rather, each of the fathers was instructed to immediately contact MCDCS following their release from incarceration. O.Y. was released in March 2011. W.B., however, remained continuously incarcerated throughout the duration of the CHINS and termination cases. Consequently, no referrals for services for W.B. were ever made by MCDCS.

Mother's participation in reunification services throughout the CHINS and termination cases was sporadic and ultimately unsuccessful. MCDCS made referrals in December 2009 for Mother to receive visitation services, a substance abuse assessment, inpatient drug treatment at the local Y.W.C.A., and an alternative out-patient community-

3

based drug-treatment program through Eric Foster's office. Mother failed to successfully complete any of these recommended services. For example, in January 2010, Mother submitted to a parenting and visitation assessment with Eric Foster, but she failed to fully engage in the resulting recommended treatment, including individual therapy to address issues involving anxiety, impulsive behavior, job readiness, parenting skills, and abusive relationships. Mother also refused to participate in the substance abuse evaluation with Eric Foster.

In February 2010 Mother entered an in-patient chemical dependency program at the Y.W.C.A. After only three weeks in the Y.W.C.A. program, however, Mother left the facility, failed to return by curfew, and thereafter never returned at all. Mother was therefore discharged from the program and the program was closed as unsuccessful. The record further discloses that Mother admitted to having failed to complete drug rehabilitation programs through the Y.W.C.A. on at least two occasions prior to the initiation of the underlying CHINS case.

Regarding visitation, Mother was initially allowed to visit the children two times a week for two-hour sessions. Mother attended only nine of twenty potential visits between December 2009 and the end of January 2010. Moreover, Mother was ten to forty minutes late for seven of the nine visits she did attend. Following the dispositional hearing in March 2010, Mother's visits with the children continued to be inconsistent. She also had several no-shows and was repeatedly late for visits. As for individual counseling, Mother attended only four sessions. She also produced twelve positive drug screens for methamphetamines from December 2009 through May 2010, not including two additional

4

"no shows" which MCDCS also considers to be positive, for a total of fourteen positive drug screens.

In May 2010, Mother enrolled herself in another inpatient drug treatment program through Harbor Lights in Indianapolis. She thereafter left the program before its completion and against the recommendation of facility personnel. Approximately two weeks later, both Mother and O.Y. were arrested and incarcerated on methamphetamine charges. Mother was later convicted and remained incarcerated for the duration of the underlying proceedings. O.Y. was released in October 2010, and referrals for a substance abuse assessment and parenting evaluation were made. O.Y. completed the substance abuse assessment and attended the first of two required appointments for the parenting evaluation. O.Y. tested positive for methamphetamines two times in November 2010, refused to show for two drug screen requests in December 2010, and was re-arrested in March 2011 on new drug-related charges. As a result, O.Y. failed to successfully complete any of the trial court's dispositional goals and remained incarcerated for the remainder of the CHINS and termination cases. He also never visited the children during the underlying proceedings.

MCDCS eventually filed petitions seeking the involuntary termination of all three parents' parental rights to the children in February 2011. A consolidated evidentiary hearing on the termination petitions was later held in September 2011. At the time of the hearing, all three parents remained incarcerated.

Mother and O.Y. were allowed to appear in person for the termination hearing. They were also each represented by counsel and testified on their own behalf. Although

5

the federal prison in Illinois denied a request to transport W.B. to Indiana for the termination hearing, he was granted permission to participate in the hearing telephonically for approximately two hours. W.B. also testified on his own behalf and was represented by counsel throughout the entire evidentiary hearing.

During the termination hearing, MCDCS presented evidence establishing that the circumstances surrounding the removal of the children from the family home remained largely unchanged, if not worse due to all three parents being incarcerated at the time. Moreover, all three parents had failed to successfully complete a majority, if not all, of the court-ordered reunification services. All three parents also remained unable to demonstrate they could provide their child/children with a safe, stable, and drug-free home environment. In addition, MCDCS presented evidence showing K.D., K.B., and B.Y. had been living together and thriving in the same foster home for nearly a year-and-a-half with a foster family who desired to adopt all three children should the court decide to grant MCDCS's termination petitions.

At the conclusion of the termination hearing, the trial court took the matter under advisement. On October 7, 2011, the trial court entered its judgments terminating Mother's, O.Y.'s, and W.B.'s parental rights to their respective children. All three parents now appeal.

**DISCUSSION AND DECISION**

When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable

6

inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

Here, in terminating Mother's, O.Y.'s, and W.B.'s parental rights, the trial court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *L.S.*, 717 N.E.2d at 208.

The "traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001).

7

Before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> * * *
>
> (C) that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). Moreover, if the trial court finds that the allegations in a petition described in Indiana Code section 31-35-2-4 are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

Here, Mother and O.Y. challenge the sufficiency of the evidence supporting the trial court's findings as to subsection (b)(2)(B) & (C) of the termination statute cited above. *See* Ind. Code § 31-35-2-4(b)(2). W.B. does not challenge the sufficiency of the evidence supporting the trial court's judgment. Rather, W.B. asserts he was denied due process of law when the court proceeded with the termination hearing in his absence. W.B. also complains that he received ineffective assistance of trial counsel when his attorney failed to "submit evidence on [W.B.'s] behalf and to cross-examine witnesses" during the termination hearing. *Appellant W.B.'s Br.* at 9. We shall address each argument in turn.

8

## I. Conditions Remedied/Threat to Well-Being

To properly effectuate the termination of parental rights under Indiana Code section 31-35-2-4(b)(2)(B), a trial court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *See, e.g., L.S.*, 717 N.E.2d at 209. Here, the trial court determined that the first two elements of subsection (b)(2)(B) had been established as to each parent. Because we find it to be dispositive under the facts of this case, however, we shall only discuss whether MCDCS established, by clear and convincing evidence, that there is a reasonable probability the conditions resulting in the children's removal or continued placement outside of Mother's and O.Y.'s care will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

When making such a determination, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. The trial court may also consider any services offered to the parent by the county department of child services and the parent's response to those services, as evidence of whether conditions will be remedied. *Id.* Moreover, MCDCS is not required to provide evidence ruling out all possibilities of

change; rather, it need establish only that there is a reasonable probability the parents' behavior will not change. *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

On appeal, Mother claims that the trial court's decision to terminate her parental rights was based "almost entirely on [Mother's] habitual pattern of conduct prior to her incarceration." *Appellant Mother's Br.* at 26. Although Mother acknowledges that she "was not successful" in overcoming her addiction to methamphetamine prior to her current incarceration, she nevertheless argues that her previous failed attempts to overcome her addiction "shows that she truly had a willingness to beat her addiction and was willing to go to great lengths to achieve her goal." *Id.* Mother further asserts that her "lack of completion in these services is more of a failure to finish than noncompliance." *Id*. at 27. Finally, Mother contends the trial court "failed to give credit to the courses and work that [Mother] put in during her incarceration," and further asserts that Mother's "efforts should not be discounted so easily." *Id.* at 27-28.

O.Y. complains that because he was incarcerated at the time the children were removed from Mother's care and was thereafter in and out of jail for a majority of the underlying CHINS and termination cases, he was unable to complete the court-ordered reunification services. O.Y. therefore contends that there is insufficient evidence to support the trial court's determination that there is a reasonable probability the conditions leading to the removal and continued placement of K.D. and B.Y. outside his care will not be remedied. O.Y. directs our attention to his testimony during the termination hearing that he "love[s] his children and would do whatever services were required once he [is] released from incarceration in December [2012]." *Appellant O.Y.'s Br.* at 9.

10

In terminating Mother's and O.Y.'s parental rights, the trial court made numerous, detailed findings regarding both parents' habitual patterns of drug use and addiction, criminal activities, periods of incarceration, and neglectful parenting. Specifically, the trial court noted that both parents remained incarcerated at the time of the termination hearing on drug-related charges, and that "reunification with either parent would require the children to wait in the system even longer than the twenty-three months they have already been involved with [MCDCS]." *Appellant Mother's App.* at 4. The court went on to recognize that both parents testified that they will be released to drug rehabilitation programs which will take an additional six weeks (Mother) to one year (O.Y.) to complete and that "for the safety of the children" psychologist Dr. Mary Wood had recommended that the children not be returned to either parent for approximately six to nine months after their release in order for the parents to "be able to prove themselves and their sobriety in the community," especially considering the significant statistical data showing relapse upon release to be "a strong possibility." *Id.*

The trial court also found:

[Mother] and [O.Y.] had the opportunity to participate in services during periods of time when they were not incarcerated and they failed or refused to do so. Here, [Mother] did not fully participate in scheduled visits, she did not follow through with drug treatment, [and] she tested positive for methamphetamines in 80% of the drug screens administered. [O.Y.] stated that he did not want to participate in visits, he tested positive for methamphetamine on every drug screen administered to him, and he failed to stay in contact with [MCDCS] which would have allowed him to participate in additional services.

11

*Id.* at 7-8. Additionally, the trial court acknowledged Mother's repeated attempts at drug rehabilitation and found that the "habitual pattern of conduct displayed by [Mother] suggests she is likely to fail again." *Id.* at 9. The court went on to find:

> [A]lthough Mother should be commended for her success in treatment while at the Indiana Department of Correction, Dr. Wood testified that parents released from incarceration often relapse, and [Dr. Wood] stated that she would need to see a track record of clean drug screens for six to nine months in order to believe that the conditions resulting in removal had been remedied in this case.

*Id.* at 10. Moreover, the trial court noted Dr. Wood's additional testimony that "success in a prison drug treatment program proves nothing about how a parent will do when released back into the community." *Id.* In addition, the court found that the underlying CHINS cases involving Mother's children are "not the first time that [Mother] has been involved with [MCDCS]," noting K.B. was found to be a CHINS in 2004 and further finding that Mother "not only has a history of drug use, and relapse, she also has a history of failing to provide for her child. That history must be considered and that history weighs against forcing the children to continue to wait for [the] parents to be ready to parent." *Id.* at 11.

As for O.Y., the trial court noted that he has "four children in addition to those who are the subject of this case," and that O.Y. reported that he "did not have visitation with any of the children." *Id.* The trial court also noted that the "'Prognostic Opinion'" contained in O.Y.'s November 2010 addictions assessment described O.Y.'s prognosis for substance abuse treatment as "guarded." *Id.* The assessor further reported that O.Y. did not appear to have the "motivation and desire to obtain his children," admitted that he began using a gram of cocaine daily at the age of fifteen, and confirmed that he had also

used other drugs including "amphetamines and methamphetamine." *Id.* Finally, the trial court found that O.Y.'s history of drug use, multiple incarcerations, and failure to provide "even a visit" to his children "weighs against forcing the children to continue to wait for [the] parents to be ready to parent." *Id.*

Our review of the record leaves us convinced that ample evidence supports the trial court's findings cited above. At the time of the termination hearing, Mother's and O.Y.'s respective circumstances remained largely unchanged. Although Mother appears to have maintained her sobriety for several months as part of the terms of her criminal incarceration and participation in the C.L.I.F.F. Program, testimony from MCDCS case manager Jacqueline Smith ("Smith") and Addictions Counselor Kathleen Davidson confirmed that Mother had failed to successfully participate in or complete a majority of the court-ordered reunifications services, including individual counseling, regular visitation with the children, and substance abuse treatment prior to her most recent incarceration. Consequently, Mother's long-term ability to properly care for the children and maintain her sobriety without the threat of incarceration after many years of addiction and neglectful parenting remains unknown. Moreover, Mother was not scheduled to be released until late-November 2011, would have to complete six weeks in a half-way house, and then would require approximately six to nine additional months to complete services and maintain her sobriety before MCDCS would be willing to consider placing the children back in her care. O.Y's projected availability to parent the children at the time of the termination hearing was even more tenuous than Mother's, as he was not scheduled to be released from incarceration until mid-December 2011, and he planned on immediately

13

transitioning to a local Salvation Army facility where he would live and participate in a year-long substance abuse rehabilitation program.

When asked whether she believed that the conditions causing removal of the children had been remedied by either Mother or O.Y., case manager Smith answered in the negative. Smith went on to explain that Mother had a history of non-compliance prior to her incarceration, failed to participate in the recommended substance abuse treatment programs, was currently incarcerated on drug-related charges which was "part of the reason [MCDCS] was involved in the first place," and had been unable to "demonstrate to [MCDCS] that she would be successful in remedying the reasons for removal" once released from incarceration. *Tr.* at 203-04. As for O.Y., Smith testified that O.Y. had also been "in and out of incarceration for the length of our [MCDCS's] involvement," that most of his criminal charges had been "methamphetamine[-]related charges," he was currently incarcerated, and he failed to participate in "any of his services we've offered . . . ." *Id.* at 204.

This court has repeatedly recognized that "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 375 (Ind. Ct. App. 2006), *trans. denied*. Moreover, where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Here, for nearly two years, Mother and O.Y. demonstrated a persistent unwillingness or inability to refrain from criminal activity and to take the actions

14

necessary to show that they are capable of providing their children with the safe, stable, and drug-free home environment they need. Both parents' arguments on appeal, emphasizing their purported change in circumstances rather than the evidence cited by the trial court in its findings, amount to an impermissible invitation to reweigh the evidence. *See e.g. In re D.D.*, 804 N.E.2d at 265.

## II. Best Interests

We next consider Mother's and O.Y.'s assertions that MCDCS failed to prove that termination of their parental rights is in the children's best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by MCDCS and look to the totality of the evidence. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the child. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.*

In addition to the findings previously cited, the trial court made numerous additional pertinent findings relating to the children's best interests. In so doing, the trial court found that the "CASA [Court-Appointed Special Advocate], case manager, and the child[ren's] therapist all testified that termination of parental rights is in the child[ren's] best interest[s]. The testimony of all three is given great weight." *Appellant Mother's App.* at 25-26. The court also acknowledged CASA Laura Yeager's ("Yeager") testimony that all three children had "come a long way since being removed from the care of their biological family." *Id.* at 11, 24. In so doing, the court noted Yeager's testimony that K.D had

15

"changed incredibly" since being placed in foster care and now appeared less "worried," "more confident," and acted "more like a child than a parent." *Id*. at 11-12. The court likewise relied on Yeager's testimony that K.B. was initially "withdrawn," "did not readily engage, and was skeptical of new people," but now is "more confident, comfortable, trusting, and more relaxed overall." *Id.* at 24. In addition, the trial court found both K.D. and K.B. had "expressed [that] they want to stay in the foster home." *Id.* at 22.

As for B.Y., the court recognized in its findings that when Yeager first met B.Y. he "grunted" and "whined," and had "limited verbal communication," but now was "self-confident" and "playful." *Id.* The court also found that all three children were bonded to each other, as well as to their foster family, and required permanency now. Moreover, the trial court specifically found:

> In this case, the CASA, case manager, and the children's therapist all testified that the children need permanency, and the sooner permanency can be achieved the better. All described that permanency is demanded so that the anxiety of not knowing where they will live, and who will care for the children can end. Without permanency[,] the therapist opined [that] the children could suffer irreparable psychological harm. That cannot be ignored. Termination of parental rights is necessary to protect the children in this case.

*Id.* at 15, 27. These findings, too, are supported by the evidence.

During the termination hearing, Dr. Wood testified that K.D. had reported, and Mother admitted, there had been a "significant" amount of "domestic violence" and "fighting" with O.Y. in the family home prior to the children's removal that had been "very disturbing and frightening" to K.D. *Tr.* at 40, 67. Dr. Wood also informed the trial court that the children had experienced several significant life changes, including removal from

16

Mother's care and two relative placements prior to the current foster care placement. Dr. Wood thereafter explained that there is a "limit to the number of losses and changes people can experience before it starts really affecting them psychologically." *Id.* at 60. In recommending termination of parental rights as being in the children's best interests, Dr. Wood testified that K.D. was "at a very high risk for developing more serious disorders such as panic disorder and that K.B. was likewise at "high risk for depression" due to her "personality" and "history of losses and sort of the way she dwells on and thinks of and counts up her losses." *Id.* at 103. Dr. Wood therefore advised that establishing permanency for the children was essential. She further testified that waiting for one of the parents to be released from incarceration and to prove he or she could remain drug-free and properly care for the children would not be beneficial to the children and would instead create a lot of "prolonged anxiety." *Id.*

Case manager Smith likewise recommended termination of parental rights, testifying that she believed it would be "detrimental to [the children] to be returned to the parents who cannot prove to us or demonstrate to us that they have remedied the reasons why we're involved." *Id.* at 207. Moreover, CASA Yeager reported that the children were "doing quite well in the current placement" and were "absolutely" bonded with their foster family. *Id.* at 130, 135. Yeager further testified that she believed it would be "an emotional blow" for the children to be removed from their current foster family. *Id.* at 142.

Based on the totality of the evidence, including Mother's and O.Y.'s ongoing incarceration, unresolved substance abuse issues, significant history of neglectful conduct in caring for the children, and continuing inability to provide the children with a safe and

17

stable home environment, coupled with the testimony from Dr. Wood, Smith, and Yeager recommending termination of the parent-child relationships, we conclude that there is ample evidence to support the trial court's determination that termination of Mother's and O.Y.'s parental rights to their respective children is in K.D.'s, K.B.'s, and B.Y.'s best interests.

### III. Due Process

We now turn to father W.B.'s allegations that he was denied due process of law and received ineffective assistance of counsel during the termination hearing. "The Due Process Clause of the U.S. Constitution and the Due Course of Law Clause of the Indiana Constitution prohibit state action that deprives a person of life, liberty, or property without a fair proceeding." *In re C.G.*, 954 N.E.2d 910, 916 (Ind. 2011). Parental rights constitute an important interest warranting deference and protection, and a termination of that interest is a "'unique kind of deprivation.'" *Id.* (quoting *Lassiter v. Dep't of Soc. Servs.,* 452 U.S. 18, 27 (1981)). Children have an interest, however, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships. *Id.* at 917 (citing *Lehman v. Lycoming Cnty. Children's Servs. Agency,* 458 U.S. 502, 513 (1982)).

Notwithstanding the significance of the rights involved herein, it is well-established that a party on appeal may waive a constitutional claim. *McBride*, 798 N.E.2d at 194. In particular, we have previously held that a parent may waive a due process claim in a CHINS or involuntary termination case when it is raised for the first time on appeal. *Id.* at 194-95; *see also In re K.S.*, 750 N.E.2d 832, 834 n.1 (Ind. Ct. App. 2001) (concluding

18

mother waived claim that trial court violated her due process rights in failing to follow statutory requirements governing permanency hearings, case plans, and dispositional orders because she raised constitutional claim for first time on appeal). This is in keeping with the long-standing general rule that an issue cannot be raised for the first time on appeal. *McBride*, 798 N.E.2d at 194.

The record reveals that, although W.B. was represented by counsel throughout the duration of the termination case and even appeared telephonically for a portion of the final evidentiary hearing, he never objected to proceeding with the termination hearing. Nor did W.B. or his attorney request a continuance. Rather, W.B. has raised his procedural due process claim for the first time on appeal. We therefore conclude that Father has waived his constitutional challenge. Waiver notwithstanding, given our preference to review a case on its merits, we shall nevertheless consider W.B.'s allegations of error.

W.B. claims he was "severely disadvantaged by his inability to hear the evidence presented against him and to consult with his attorney to counter and correct it." *Appellant W.B.'s Br.* at 8. When the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of due process. *See Santosky v. Kramer,* 455 U.S. 745 (1982). The U.S. Supreme Court has explained the importance of heightened due process protections whenever the State wishes to sever the parental bonds of children as follows:

> The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything,

19

persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

*C.G.,* 954 N.E.2d at 917 (citing *Santosky,* 455 U.S. 745 at 753-54). Although due process has never been defined, the phrase embodies a requirement of "fundamental fairness." *E.P. v. Marion Cnty. O.F.C.,* 653 N.E.2d 1026, 1031 (Ind. Ct. App. 1995) (quoting *Lassiter,* 452 U.S. at 26).

The U.S. Supreme Court has written that "the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976). The process due in a termination of parental rights proceeding turns on the balancing of three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure. *A.P. v. Porter Cnty. Office of Family & Children,* 734 N.E.2d 1107, 1112 (Ind. Ct. App. 2000), *trans. denied* (citing *Mathews,* 424 U.S. at 335). The balancing of these factors recognizes that although due process is not dependent on the underlying facts of the particular case, it is nevertheless "flexible and calls for such procedural protections as the particular situation demands." *Mathews,* 424 U.S. at 334. Finally, we must keep in mind the general principle that "if the State imparts a due process right, then it must give that right." *A.P.,* 734 N.E.2d at 1112. In Indiana, a parent in a proceeding to terminate the parent-child relationship is statutorily entitled to (1) cross-examine witnesses, (2) obtain

20

witnesses or tangible evidence by compulsory process, and (3) introduce evidence on behalf of the parent. *See* Ind. Code § 31–32–2–3(b).

Here, in balancing the three-prong *Mathews* test, we first acknowledge that W.B.'s private interest affected by the proceeding -- a parent's interest in the care, custody, and control of his or her child -- is substantial. *See In re C.C.,* 788 N.E.2d 847, 852 (Ind. Ct. App. 2003), *trans. denied.* We also recognize that the State's countervailing *parens patriae* interest in protecting the welfare of a child is likewise substantial. *Id.* We therefore must examine the third *Mathews* factor, namely, the risk of error created when the trial court proceeded with the termination hearing despite W.B.'s physical absence.

As our Indiana Supreme Court has recently emphasized, trial judges are in the best position to assess witness credibility. Certainly, "a trial judge is not as easily able to ascertain the credibility of a witness over the phone." *C.G.*, 954 N.E.2d at 921. Nevertheless it is well-settled in Indiana that "there is no absolute right of a parent to be present at a termination hearing." *Id.; see also In re E.E.,* 853 N.E.2d 1037, 1044 (Ind. Ct. App. 2006) (stating that parent does not have constitutional right to be physically present during termination hearing), *trans. denied.* Rather, the decision as to whether or not an incarcerated parent will be permitted to attend a termination of parental rights hearing rests "within the sound discretion of the trial court judge." *C.G.*, 954 N.E.2d at 922.

The record makes clear that W.B. was represented by counsel throughout the entire termination case, including during the final evidentiary hearing. Moreover, W.B.'s counsel cross-examined several of the State's witnesses, submitted evidence of W.B.'s activities/accomplishments while incarcerated, and made closing arguments on W.B.'s

21

behalf. Although W.B. did not appear for the termination hearing in person, he did appear telephonically for a portion of the hearing and was allowed to testify on his own behalf. Thus, W.B.'s version of events was directly presented to the trial court. Also significant, W.B. has failed to allege and/or prove he suffered any specific prejudice as a result of not being personally present for the entire termination hearing. Moreover, W.B.'s own testimony established that he had a significant criminal history, had been continuously incarcerated in federal prison since K.B. was an infant, was not scheduled to be released from incarceration until January 2013, would remain in a half-way house until July 2013, and had not visited with or provided any type of financial or emotional support for K.B. since before he became incarcerated in 2004. Based on the foregoing, it is clear that any risk of error caused by the trial court's decision to proceed with the termination hearing was minimal. Moreover, after balancing the substantial interest of W.B. with that of the State and in light of the minimal risk of error created by the challenged procedure, we conclude that the trial court's decision to proceed with the termination hearing in W.B.'s absence did not deny W.B. due process of law.

## IV. Ineffective Assistance of Counsel

We now turn to W.B.'s final contention that he was denied effective assistance of trial counsel. Father contends he was not afforded effective assistance of trial counsel in this case because counsel "should have . . . objected to the trial court's September 14, 2011 Request for Telephonic Hearing. . . ." *Appellant W.B.'s Br.* at 8. W.B. further asserts that counsel failed to "submit evidence on [his] behalf and to cross-examine witnesses." *Id.* at 9.

When a parent asserts on appeal that his or her lawyer underperformed, the focus of the inquiry is "whether it appears that the parent[] received a fundamentally fair trial whose facts demonstrate an accurate determination." *Baker v. Marion Cnty. Office of Family & Children*, 810 N.E.2d 1035, 1041 (Ind. 2004). Thus, the question is not whether the lawyer might have objected to this or that, but whether the lawyer's overall performance was so defective that the appellate court cannot say with confidence that the conditions leading to the removal of the child from parental care are unlikely to be remedied and that termination is in the child's best interests. *Id.*

Applying this standard to the present case, we find W.B.'s claim to be unpersuasive. The record reveals that W.B.'s attorney successfully elicited testimony from W.B. and submitted into evidence two exhibits containing multiple documents. After Father's testimony and telephonic participation in the hearing was concluded, W.B.'s attorney continued to represent W.B. by effectively cross-examining multiple witnesses and proffering persuasive closing arguments against granting MCDCS's petition to involuntarily terminate W.B.'s parental rights. Also significant, W.B. does not challenge the sufficiency of the evidence supporting the trial court's termination order on appeal.

Based on the foregoing, and in light of the evidence presented by MCDCS concerning W.B.'s habitual conduct previously discussed, we conclude that W.B. has failed to show he was prejudiced by his attorney's alleged deficient performance.

Affirmed.

BAKER, J., and BROWN, J., concur.